# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| DAVID HOOPER, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION: 1:19-01011-KD-MU |
| ) | |
| OFFICER ASHLEY CARLISLE, ) | |
|     Defendant. ) | |

## ORDER

This matter is before the Court on Defendant's motion for summary judgment (Docs. 31, 32), Plaintiff's Opposition (Docs. 36, 37), and Defendant's Reply (Docs. 40, 41).

## I.  Findings of Fact[1]

On November 21, 2019, Plaintiff David Hooper (Hooper) initiated this constitutional and civil rights action against Defendant City of Fairhope Police Officer Ashley Carlisle (Officer Carlisle),[2] stemming from his April 13, 2018 arrest in Fairhope, Alabama.  (Doc. 1).  On that date, Hooper drove into downtown Fairhope in his white Toyota Camry around the same time Officer Carlisle[3] received a BOLO regarding a white Toyota Camry.

Specifically, at 5:26 p.m. the City of Fairhope Police Department received a report that a white Toyota Camry was driving recklessly while traveling westbound in the area of Fairhope Avenue from Greeno Road. (Doc. 32-1 at 13-15, 18 (Dep. Carlisle at 59-61, 69)). At 5:28 p.m. Fairhope's dispatcher

---

[1] The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[2] Defendant's name of record on the docket is Carlisle; however, Defendant's filing indicates that "Ashley Carlisle Faldoski" is her current correct name.

[3] Carlisle completed her field training program in January 2018: "after that, I was by myself acting as a police officer."  (Doc. 32-2 at 7 (Dep. Carlisle at 17)).

created and put out a be-on-the-lookout ("BOLO") report to all units within that vicinity; "Unit 113" -- Officer Carlisle -- was dispatched at that time. (Id. at 13, 16 (Dep. Carlisle at 59, 62)).

Subsequently, while traveling on Bancroft Street in the area of Fairhope Avenue, Officer Carlisle observed a white Camry heading west towards Section Street. (Id. at 19 (Dep. Carlisle at 71)). At 5:31 p.m., Officer Carlisle turned right onto Fairhope Avenue to get behind the vehicle. (Id. at 17 (Dep Carlisle at 63)). Officer Carlisle observed the vehicle turn south on Section Street and pull into a parking spot just before De La Mare Avenue. (Id. at 19 (Dep. Carlisle at 71)). "[H]e turned south on to Section Street and immediately pulled into a parking spot without using his turning signal." (Doc. 32-1 at 21 (Dep. Carlisle at 73)). Per Officer Carlisle, "I didn't stop him for the turning signal, but that's what I observed." (Id. at 22 (Dep. Carlisle at 74)). But, to her, "it's somewhat suspicious that as soon as I get behind a vehicle, it pulls into the first immediate parking spot and he got out super quickly and started to, like, get away from me -- or walk away from me[.]" (Id. at 23 (Dep. Carlisle at 23)). Per Officer Carlisle, she pulled into a spot behind Hooper and exited her vehicle and asked him to speak with her, and he cooperated. (Id. at 24 (Dep. Carlisle at 84); Doc. 32-2 at 16 (Dep. Hooper at 56)).

According to Officer Carlisle, Hooper "kind of seemed out of breath...kind of confused[,]" so she asked if he had any issues "getting there" and explained the BOLO for a car matching his vehicle. Hooper denied any road rage incidents, etc. (Doc. 32-1 at 25 (Dep. Carlisle at 85)). At some point Officer Carlisle asked Hooper to remove his sunglasses "to look at his eyes," and she determined "he had bloodshot, glassy eyes with constricted pupils." (Id. at 26 (Dep. Carlisle at 88); Doc. 32-2 at 17 (Dep. Hooper at 57)). Officer Carlisle asked Hooper about his eyes (why there were read and glossy), and he explained he had been "up since four [am] and working all day." (Doc. 32-1 at 25 (Dep. Carlisle at 88); Doc. 32-2 at 17 (Dep. Hooper at 57)).

Officer Carlisle then asked Hooper if he had consumed any alcohol or taken any drugs. Hooper denied consumption of alcohol or any medication that day. (Id. at 27-28 (Dep. Carlisle at 93-94)). Hooper offered to be tested: "I wasn't nervous, because I knew I was 100 percent sober." (Doc. 32-2 at 12 (Dep. Hooper at 52)). Officer Carlisle then asked Hooper to perform the field sobriety test. (Id. at 14 (Dep. Hooper at 54); Doc. 32-1 at 27 (Dep. Carlisle at 93)). Officer Carlisle did not smell any alcohol on Hooper, but thought he was "just kind of, like, off balance, maybe, or going back and forth between his two feet." (Id. at 94). Per Hooper:

> Officer Carlisle was insinuating that I was intoxicated, which is completely false. I had ingested no alcohol, prescription drugs, illegal drugs, inhalants or any intoxicating substance on the day in question. I was not exposed to any chemical at work that would cause any sort of impairment. I told her this, plain and simple. She made no effort to verify this accurate statement and continued to question me. At one point, I said something to the effect of, "what, do you want me to take a test or something?" I was not volunteering to take a field sobriety test; I was merely seeking to see what Officer Carlisle's intent was in this situation .... Officer Carlisle did, in fact, request that I take a sobriety test. I willingly complied with this request because I knew that I was completely sober and performing the test would put an end to this unfortunate situation. I know, to this day, that Officer Carlisle had no good reason to suspect me of any traffic violation, let alone any intoxication. I was not doing anything that would cause any reasonable person to be suspicious of my conduct. I complied with her demands at every turn because I am a responsible citizen that respects law enforcement.
>
> When Officer Carlisle began to administer the field sobriety test, I followed her directions at all times. I complied and satisfied every component of the test. Any suggestion to the contrary is false.....

(Doc. 36-8 at 3-4 (Aff. Hooper)).

Officer Carlisle began performing the Standard Field Sobriety Test ("FST") on Hooper.[4] Officer Carlisle testified that first, she instructed Hooper to put his feet together, arms down by his side, and to look at the tip of her finger (which she had held up), and follow it with his eyes only, so that she could make sure the eyes are tracking correctly with equal pupil size. (Doc. 32-1 at 30, 33-34

---

[4] Per Hooper, Officer Carlisle gave him the heel-to-toe test first. (Doc. 32-2 at 15, 19 (Dep. Hooper at 55, 65)). Hooper was wearing flip-flops, "so it was a little bit more difficult than had I been in regular shoes." (Id.)

3

(Dep. Carlisle at 100, 103-104)). Per Officer Carlisle: "[h]is equal tracking was good and his pupil size was even on both eyes." (Id. at 35 (Dep. Carlisle at 105)).

Officer Carlisle testified that second, she performed the lack of smooth pursuit portion of the test, looking for Hooper to follow his finger and to see if the eyeball can follow the finger without jumping back and forth -- without showing signs of nystagmus (involuntary jerking) which would indicate impairment. (Id. at 36-37, 41-42 (Dep. Carlisle at 106-107, 110-111)). Officer Carlisle noticed a lack of smooth pursuit in both of Hooper's eyes -- that his eyes were jerking the whole time. (Id. at 43 (Dep. Carlisle at 113)). Per Officer Carlisle: "both eyes had a lack of smooth pursuit....distinct and sustained nystagmus and ..... an onset of nystagmus prior ... to forty-five degrees." (Id. at 46 (Dep. Carlisle at 116)). Officer Carlisle testified that next, she checked for distinct and sustained nystagmus at maximum deviation, and she observed it in both of Hooper's eyes. (Id. at 47-49 (Dep. Carlisle at 117-119)). This completed this portion of the test (the HGN - horizontal gaze nystagmus test). (Doc. 32-1 at 50 (Dep. Carlisle at 120)). Per Hooper, this test took less than one minute. (Doc. 32-2 at 28 (Dep. Hooper at 75)).

Officer Carlisle testified that third, she performed the walk and turn portion of the test on Hooper (while he wore flip flops), comprised of 9 heel-to-toe steps front and back in a straight line; Hooper does not remember if she gave him instructions about keeping his hands by his side. (Doc. 32-1 at 54-56 (Dep. Carlisle at 127-129); Doc. 32-2 at 19-20 (Dep. Hooper at 65-66)). Hooper does not remember whether Officer Carlisle showed him how to do the test. (Doc. 32-2 at 20 (Dep. Hooper at 66)). Hooper testified that he kept his arms by his side as he walked and had his arms by his side the entire time, and he does not remember any gaps between his steps. (Id. at 22 (Dep. Hooper at 68)). Per Hooper: "[h]owever she told me to do it, that's how I did the test[;]" "I just followed her directions exactly." (Id. at 23 (Dep. Hooper at 69)). Then, Officer Carlisle instructed Hooper about the one-leg

4

stand test, lifting a foot 6 inches off the ground and counting out loud until he was told to stop; during this test she states she observed him sway with his arms held out for approximately 26-30 seconds. (Doc. 32-1 at 57, 59 (Dep. Carlisle at 139, 142).

At 5:36 p.m., and just as the one leg stand test was being concluded (the last portion of the Field Sobriety Test) City of Fairhope Police Officers David Miller (Miller) and Trent Scott (Scott) arrived at the scene. (Doc. 32-1 at 17 (Dep. Carlisle at 63)).  Officer Scott and Officer Carlisle gave Hooper a breathalyzer test and he blew a 0.0, which Office Carlisle acknowledged to Hooper.  (Doc. 32-1 at 97-98 (Tr. Officer Scott Bodycam at 5); Doc. 32-3 at 11 (Def's Resp. to RFA #1)).  Officer Carlisle asked Officer Scott, a more experienced officer, to "look at his eyes and see if he had a prominent nystagmus[]" to confirm what she saw.  (Doc. 32-1 at 51 (Dep. Carlisle at 124)). Officer Scott then performed a partial horizontal gaze nystagmus (HGN) test. (Doc. 32-1 at 97-98 (Tr. Officer Scott Bodycam at 5)). Officer Scott did not perform a full HGN. (Id. at 124-125). Officer Scott asked Officer Carlisle "did you see what I saw?" to which she responded "[w]hat did you see?"  (Doc. 32-1 at 99 (Tr. Officer Scott Bodycam at 6)). That is when Officer Scott told her "lack of smooth pursuit" "[r]ight around or at or around maximum"  (Id.) Officer Carlisle then said "[s]o he's on something[]" to which Officer Scott replied "[o]ther than alcohol, yeah." (Id.)

> Officer Carlisle explained her thinking at that point to Officer Scott:
>
> I did the whole field sobriety test with him. He's obviously impaired. As soon as he saw me, he pulled into a parking spot without using his turning signal. I made a consensual contact with him.  He agreed to hand me his license, talk to me. I told him why I was making contact with him, that we got a reckless driver call, so on and so on. And then I asked him to lift up his glasses.  Also, he had red, glassy pupils.  Very small. So then I went for the field sobriety. And from there, I noticed indicators of impairment....
> ***
> Lack of smooth pursuit, nystagmus at maximum deviation. And I noticed onset prior to 45 degrees....
> ***

5

> ....I wanted to make sure that you were seeing what I was seeing. Because I ran through the whole field sobriety test. For the walk-and-turn, he missed heel-to-toe, improper turn. He used arms for balance, and I believe that's it. So three. For the one leg stand, he used arms for balance. So it's only one, but nystagmus is, you know, the most (inaudible). So from here, I mean, I don't feel comfortable letting him drive at all.
>
> \*\*\*
>
> Because I believe he's impaired.
>
> \*\*\*
>
> I don't know what I should do from here....
>
> \*\*\*

(Doc. 32-1 at 99-102 (Tr. Officer Scott Bodycam at 6-9)). Officer Carlisle determined there was probable cause to arrest Hooper "[a]fter the field sobriety test was completed." (Doc. 32-1 at 61, 63 (Dep. Carlisle at 149, 151)). Officer Carlisle then told Hooper he was being arrested for DUI: "I believe you're intoxicated. I don't believe it's alcohol. I believe it's something else." (Id.) Officer Carlisle arrested Hooper for Driving Under the Influence ("DUI") -- "Any Substance" -- pursuant to Ala. Code § 32-5A-191(a)(5) ("under the Influence of any substance which impairs the mental or physical faculties of such person"). (Doc. 32-1 at 111; Doc. 36-11 (Arrest Report)).

Hooper then stated "[t]his is ridiculous[]" stating that he is a safety officer at a plant and is "drug tested regularly. I haven't taken drugs[]" adding he is not prescribed medications or anything. (Doc. 32-1 at 104 (Tr. Officer Scott Bodycam at 11)). Officer Scott then communicated with the radio or dispatch which asked if they should "get the Draeger[]" to which he responded "[n]o. It's going to be pills." (Id. at 105 (Tr. Officer Scott Bodycam at 12)). Hooper then asked to be blood tested. (Id.)

Following the arrest, officers took Hooper to Thomas Hospital on the way to the police station, where a blood draw test was administered. Thereafter, Hooper was incarcerated for twelve (12) hours and released at 6:00 a.m. the next day, April 14, 2018. During this time, Hooper's family did not know his whereabouts for several hours and his spouse feared for his safety. As soon as Hooper was released from jail, he went to an Urgent Care to take a urine test; the test revealed no drugs or alcohol in his system. (Doc. 36-13).

On July 11, 2018 the City dismissed the charges against Hooper with prejudice. (Doc. 36-1 at 2). On July 23, 2018, Hooper filed a Citizen Complaint Form with the City of Fairhope Police Department. (Doc. 32-2 at 11 (Dep. Hooper at 41); Doc. 32-2 at 31-34). The Citizen Complaint provides Hooper's version of events, as follows:



7

I said I don't know what to tell you. She asked if I had been drinking. I said no and asked her if she wanted me to take a test. She said yes. She asked me to do a heel to toe and turn. I performed that test. She then asked me to follow her finger with my eyes. I did. She then asked me to stand on one foot with my hands by my side and start counting and start with 1001. I did and got to around 1025, when she told me to stop and put my foot down. My foot did not drag during the test and I did not move my arms. At that time, Officer Scott arrived in front of me & officer Miller arrived behind me. Officer Scott gave officer Carlisle a breathalizer and she asked me if I could take that test. I asked if the mouth wash I had used would effect the test and officer Scott said no. I blew and asked what it read. Zero & officer Carlisle said yep. At that time officer Scott & Carlisle had a discussion and then officer Scott asked me to follow his finger with my eyes. I did. Officer Scott & officer Carlisle then again walked away. At that time I spoke with officer Miller and told him I did not understand why this was happening. I told him I was a Safety Mgr at a steel plant and he asked where and how far. We talked for a couple of moments. At that time officer Carlisle came back and said I was under arrest for DUI. I asked what for and at that time she stated I had failed my field sobriety test. Going to her vehicle she said I was definitely under the influence of some substance. I then asked for a drug test. She then took me to booking. We then went to Thomas Hospital for my blood test and then back to holding. I asked her what happens when the test comes back negative? She stated "If it comes back negative then I should go see a doctor because the way my eyes moved I would have a serious medical problem." I do not agree with statements in her report about failing the field test at all. Unfortunately his body cam & cruiser cam were not working. The only video that exists is officer Scott & officer Miller's.



(Doc. 32-2 at 31-34).  See also Doc. 36-8 (Aff. Hooper)).

Officer Carlisle testified that her decision to arrest Hooper was based on "a totality of everything;" all [6] indicators on the horizontal gaze nystagmus test, 3 of 8 indicators on the walk and turn test, 2 out of 4 indicators on the one-leg stand test, and the following:

> For me, it's the whole -- the whole call, start to finish. It's the reckless driver call ... suspicious behavior as soon as I get behind him. He gets into a parking lot gets out of his car quickly, walks away. I have to call him back to me. Then we start -- we look at the eyes, got bloodshot and glassy eyes. He's out of breath. Then we start the field sobriety ... all of these things together ... That's the totality if the circumstances for me.

(Doc. 32-1 at 61-63 (Dep. Carlisle at 149-151)).  As summarized by Officer Carlisle:

> On the Horizontal Gaze Nystagmus Test, Mr. Hooper demonstrated three clues contained on the SFST: (i) he demonstrated a lack of smooth pursuit in both eyes; (ii) he demonstrated distinct and sustained Nystagmus in both eyes; and (iii) he demonstrated onset of Nystagmus prior to 45 degrees in both eyes.  Officer Trent Scott also administered a ...[HGN]...and observed similar findings.

9

> On the Walk and Turn Test, Mr. Hooper demonstrated three clues contained on the SFST: (i) he missed heel to toe; (ii) he used his arms to balance during the test; and (iii) he turned improperly.
>
> On the One Leg Stand Test, Mr. Hooper demonstrated two clues contained on the SFST (i) he used his arms to balance; and (ii) he swayed while doing the test.
>
> Based on my observations of Mr. Hooper, placed him under arrest for driving under the influence ...
>
> ....During the two hours I spent with Mr. Hooper, he became more coherent and less intoxicated.

(Doc. 32-3 at 4 (Def's Resp. to Interrog. #8)).

Hooper contends he was not impaired, had not consumed alcohol, drugs or inhalants, and that he has no familiarity with field sobriety tests or indicators of impairment. Hooper alleges that he was wrongfully arrested for DUI and that as a result, he has incurred damages including missed time from work, impound charges, attorneys' fees, mental anguish, and emotional distress. Additionally, Hooper argues that the false arrest placed him in danger of losing his employment, despite a total absence of misconduct. As such, Hooper initiated this action and asserts that Officer Carlisle violated his constitutional rights to be free from unlawful search and seizure and improperly denied his liberty, and that there was no arguable probable cause for the arrest.

Hooper alleges the following claims against Officer Carlisle in her individual capacity: 1) Claim I - 42 U.S.C. § 1983 Fourth Amendment False Arrest/False Imprisonment; and 2) Claim II Ala. Code § 6-5-170 False Imprisonment. Hooper seeks a declaration that Officer Carlisle violated his federal rights, damages, 42 U.S.C. § 1988 attorneys' fees/costs, and other relief.

**II.    Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c) provides as follows:

> *(c) Procedures*
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex,

477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

### III.  **Conclusions of Law**

As noted *supra*, Hooper asserts a Section 1983 federal claim and a state law claim against Officer Carlisle in her individual capacity for false arrest/false imprisonment. As an initial matter, the Court assesses whether Hooper's Section 1983 claims may proceed before addressing the state law claims. Officer Carlisle has asserted immunity for all claims.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To sustain a cause of action based on section 1983, [a plaintiff] must establish ...(1) that [he] suffered a deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States, and (2) that the act or omission causing the deprivation was committed by a person acting under color of law." Wideman v. Shallowford Community Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir.1987) (internal quotations and citation omitted).

When qualified immunity is raised as basis to grant summary judgment, as is the case here, the Eleventh Circuit has advised district courts to:

> ....approach the facts from the plaintiff's perspective because "[t]he issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998). As this Court has repeatedly stressed, the "facts, as accepted at the

summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000). Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff. See Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).

McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009) (quoting Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002)). "At this juncture, we outline the [plaintiff's] version of the events." Hawkins v. Carmean, 562 Fed. Appx. 740 (11th Cir. 2014). Additionally, "[i]n order to overcome summary judgment because of qualified immunity, 'the facts in dispute must raise a genuine issue of fact material to the determination of the underlying issue.'" Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012).

Officer Carlisle contends that she is entitled to qualified immunity for all claims. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Brown v. City of Huntsville, 608 F.3d 724, 733 (11th Cir. 2010). The defense of qualified immunity is predicated on a showing by the defendant police officer that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee, 284 F.3d at 1194. "To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities." Crosby v. Monroe Cty., 394 F.3d 1328, 1332 (11th Cir. 2004). See also Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004) ("Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize ... [and] we look to the general nature of the defendant's action....").

If Officer Carlisle establishes that she was acting within the scope of this authority at the time she allegedly committed wrongful acts, the burden shifts to Hooper to show that she is not entitled to qualified immunity. Lee, 284 F.3d at 1194. To meet his burden, Hooper must show two things. First,

13

that "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right." Id. (quoting Saucier v. Katz, 533 U.S. 194, 121 (2001)). Second, "[i]f [Hooper shows] a constitutional right would have been violated under [his] version of the facts, the court must then determine 'whether the right was clearly established.'" Id.

The Court finds that Officer Carlisle was acting within the scope of her discretionary authority at all relevant times. Specifically, that Officer Carlisle performed a legitimate job-related function when she responded to the BOLO dispatch and interacted with Hooper. Officer Carlisle is a sworn City of Fairhope Police Department officer, and responding to a BOLO falls within an officer's duties. Making an arrest is also an official responsibility of an officer. In sum, Officer Carlisle was acting under color of state law at the time of her actions; she was on duty as a City of Fairhope Police Officer and engaged in policing at the time of the arrest. Additionally, Hooper does not dispute Officer Carlisle was acting within the scope of her discretionary authority at the time. (Doc. 41 at 1). Thus, "the burden shifts to the plaintiff [Hooper] to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194. Hooper must show that: 1) the facts, "*construed in [his] favor*", establish a constitutional violation and; 2) the constitutional right at issue is clearly established." Pearson v. Callahan, 555 U.S. 223, 232 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

It is within a court's discretion as to "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236. The Court will now address whether this action identifies any constitutional violation. See, e.g., Horton v. Morgan Cty. Sheriff's Dept., 2016 WL 6576986, *6-7 (N.D. Ala. Nov. 7, 2016) (discussing same).

The Fourth Amendment protects citizens "against unreasonable searches and seizures" by police officers. *Brown,* 608 F.3d at 734 n. 15. See also U.S. Const. amend. IV. An arrest is a "seizure"

14

under the Fourth Amendment. Case v. Eslinger, 555 F.3d 1317, 1326 (11th Cir. 2009). "The 'reasonableness' of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause." Id. Lack of arguable probable cause is an essential element of Hooper's false arrest claims; should he fail to "produce admissible evidence sufficient to persuade a reasonable juror that [Carlisle] did *not* have arguable probable cause to arrest him ... [Carlisle] is entitled to qualified immunity .... and, in turn, to summary judgment." Pruitt v. Gillespie, 625 Fed. Appx. 374, 376 (11th Cir. 2015).

"A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim." Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004) (citing *Marx v. Gumbinner,* 905 F.2d 1503, 1505 (11th Cir. 1990), *abrogated on other grounds by Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020)). The existence of probable cause at the time of arrest, however, constitutes an absolute bar to a Section 1983 action for false arrest. *Marx,* 905 F.2d at 1505–1506. "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Jimenez,* 780 F.2d 975, 978 (11th Cir. 1986) (internal quotation marks and citations omitted). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams,* 407 U.S. 143, 149 (1972). It requires "more than mere suspicious, but does not require convincing proof." *Rankin v. Evans,* 133 F.3d 1425, 1435 (11th Cir. 1998). The "analysis is undertaken in light of the totality of the circumstances, and the standard 'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.'" *Smith v. Sheriff, Clay Cty., Fla.,* 506 Fed. Appx. 894, 899 (11th Cir. 2013).

Moreover, even if Officer Carlisle lacked probable cause, she is entitled to immunity if she had *arguable* probable cause to arrest. Hendricks v. Sheriff, Collier Cty., Fla., 492 Fed. Appx. 90, 93 (11th Cir. 2012); Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003). Such exists where reasonable officers in the same circumstances and with the same knowledge as the officer could have believed that probable cause existed. Brown, 608 F.3d at 734. Additionally, "what counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." Jones v. Cannon, 174 F.3d 1271, 1283 (11th Cir. 1999). "The standard is an objective one and does not include an inquiry into the officer's subjective intent or beliefs." Brown, 608 F.3d at 735. The objective standard is based on the totality of the circumstances, and is met when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir.1998). Further, while qualified immunity will protect officers who make good faith mistakes, Post v. City of Ft. Lauderdale, Fla., 7 F.3d 1552, 1558 (11th Cir.1993) *modified,* 14 F.3d 583 (11th Cir.1994), it will not protect officers whose conduct "creates factual issues as to their honesty and credibility[]" Kingsland, 382 F.3d at 1233 and Holmes, 321 F.3d at 1083–1084.

Officer Carlisle argues that Hooper cannot meet his burden of proving the arrest was a constitutional violation, suggesting that even if she was mistaken in her impairment finding, her actions were reasonable. Wood v. Kesler**,** 323 F.3d 872, 878 (11th Cir. 2003) (officers who "reasonably but mistakenly conclude that probable cause is present are entitled to immunity"); Rankin, 133 F.3d at 1435 (arrest is supported by probable cause when it is objectively reasonable based on the totality of the circumstances). Officer Carlisle argues the following establishes, at the least, arguable probable

16

cause: 1) Hooper's car fit the description of a car that had been reported driving recklessly; 2) Hooper suspiciously pulled into a parking space without signaling almost immediately after she pulled onto the street behind him and then tried to avoid her; 3) Hooper had glassy, bloodshot eyes; 4) Hooper's performance on the field sobriety test presented objectively reasonable evidence of arguable probable cause; and 5) a more senior officer at the scene confirmed her decision.

Hooper argues that Officer Carlisle falsely arrested him because he was not under the influence of alcohol, drugs, or *any other substance* at the time of the arrest. Hooper's evidence includes medical records, a contemporaneous negative breathalyzer result, an Affidavit, and his deposition testimony. Hooper also denies exhibiting the behaviors Officer Carlisle described which formed the basis of her opinion that he was impaired.

In sum, there is a factual dispute as to what occurred; particularly regarding the physical behavior and attributes of Hooper at the time Officer Carlisle encountered him. If the factfinder believes Officer Carlisle, there appears to be arguable probable cause for the arrest. But only a factfinder at trial can make this determination. See e.g., Hails v. Dennis, 779 Fed. Appx. 673, 675-676 (11th Cir. 2019) **("**Here, the district court did not err in concluding that Dennis was not entitled to qualified immunity on Hails' false arrest and false imprisonment claims.....there is a genuine dispute of material fact as to whether he had arguable probable cause to arrest Hails. As a result, there is also a genuine dispute of material fact about whether he violated Hails' well-established Fourth Amendment rights by arresting and imprisoning him. As the district court pointed out, 'Dennis' credibility is still the issue' and '[o]nly a factfinder ... may determine credibility[]'"); *Skop v. City of Atlanta,* 485 F.3d 1130, 1143–1144 (11th Cir. 2007) (denying qualified immunity where factual issues precluded a determinative ruling on probable cause); Warren v. Scott, 2015 WL 11199160, *2 (N.D. Ga. Feb. 23, 2015) ("[T]he Eleventh Circuit has also held that the 'question whether arguable probable

17

cause for the arrest existed is aptly suited for a jury' where questions of fact exist which are determinative of the existence of arguable probable cause[]"); Barnes v. Dekalb Cty., Ga., 898 F. Supp. 2d 1317, 1322–1323 (N.D. Ga. 2012) ("The disputed factual issues in this case preclude a determination that arguable probable cause existed, as a matter of law[]"); Franco v. Caldwell, 2011 WL 2262481, *6 (S.D. Fla. June 6, 2011) ("Looking at the totality of the circumstances in the light most favorable to Plaintiff, the Court cannot conclude that probable cause existed for Plaintiffs arrest, because there is an issue of disputed fact as to whether Plaintiff received a trespass warning prior to his arrest[]" and if "there is an insufficient showing of arguable probable cause, then there is clearly an insufficient showing of probable cause[]").  Accordingly, there are genuine issues of material fact as to whether Officer Carlisle had arguable probable cause to arrest Hooper, which precludes summary judgment in her favor on the issue of qualified immunity.[5]

### IV.    Conclusion

It is **ORDERED** that the Defendant's motion for summary judgment (Docs. 31, 32) is **DENIED**.

**DONE** and **ORDERED** this the **2nd** day of **February 2021.**

/s/Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[5] As issues of fact exist for Hooper's federal Section 1983 false arrest/imprisonment claim, they likewise exist for his state law claim under Ala. Code § 6-5-170.